## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**WILLIAM D. PAULEY,**
**PLAINTIFF**

VS.

**COMMISSIONER OF**
**SOCIAL SECURITY,**
**DEFENDANT**

**CASE NO. 1:07CV292**
**(BARRETT, J.)**
**(HOGAN, M.J.)**

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits in June, 2004. His onset date is November 20, 2003. Plaintiff's application was denied both initially and upon reconsideration. Plaintiff then requested an obtained a hearing before an Administrative Law Judge (ALJ) at Huntington, West Virginia in June, 2006. Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE) Donald Woolwine. The ALJ reached an unfavorable decision in October, 2006 and then Plaintiff processed an Appeal to the Appeals Council. After the Appeals Council denied review in March, 2007, Plaintiff timely filed his Complaint seeking judicial review in April, 2007.

## STATEMENTS OF ERROR

Plaintiff asserts four Statements of Error: "(1) The ALJ erroneously assessed Claimant's credibility, (2) The ALJ failed to properly consider the Claimant's pain as required under the regulations, (3) The ALJ failed to properly consider and evaluate the Plaintiff's disability under the combination of impairments Listing, and (4) The ALJ's use of an inaccurate hypothetical to the Vocational Expert to determine the Claimant's residual medical and mental functional capacity for work activity was erroneous."

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he was 44 years of age, married but separated, a father of two children, neither of whom lives with him, a licensed driver, left-handed and a high-school graduate. He lives with his brother and his family in a single-family house. Plaintiff stated that he became disabled in November, 2003 when he rear-ended a stationary and unlighted dump-truck on a dark morning in Mexico while driving at a high rate of speed. Between 1988 and 2003, Plaintiff worked as a machinist. When asked what keeps him from working, Plaintiff referred to pain in his back, arms, shoulder and right ankle. Plaintiff's primary care physician is Jeremy Fuller, M.D., whom he sees on a bi-monthly basis. Plaintiff also stated that he has a "large hernia." He stated that physical therapy did not help and that he currently takes Tramadol every 4-6 hours and Motrin, 200 mg., thrice per day for pain. Neither medication is effective. Standing and walking aggravates his back pain. Plaintiff stated he could stand for 4-5 minutes before the pain became "intense" and could sit for 10-15 minutes before having to change positions. He sleeps in a chair for approximately 3 hours per night. Plaintiff referred to his back pain as the worst.

Plaintiff stated that his right ankle was broken in the accident and that a joint was fused. He "sometimes" wears a velcro brace which prevents side-to-side movement, but can't wear the brace when his ankle swells. For pain relief, Plaintiff takes Motrin and elevates his ankle on a daily basis. Plaintiff also related that he sees a psychiatrist, Dr. Spangler, on a monthly basis. He takes or has taken Zoloft, Depakote, Klonopin, Seroquel and Cymbalta. Plaintiff described being unable to tolerate crowds and having panic attacks, which occur on a weekly basis and from a "couple of hours to a couple of days." Plaintiff testified that he avoids grocery shopping because he can't feel with his hands and drops things. He wears splints on his wrists at night, but they don't help.

When asked about the injuries sustained in the automobile accident, Plaintiff said that he was hospitalized and in a coma for several days. He sustained damage to his small intestine, kidney, spleen, liver, right lung and right ankle. He had internal bleeding. He rated his neck and back pain as a "5" on average. His neurosurgeon is Dr. Carroway. He described numbness down his left leg. He uses a cane to help his right ankle and low back.

Plaintiff testified that his doctors advised him to refrain from lifting anything over 10 lbs. because of his hernia. He has carpel tunnel syndrome, high blood pressure and high cholesterol, for

2

which he takes Zocor. Plaintiff testified about daily headaches, which he rates as between a "3" and a "7" in terms of severity. He alleviates headache pain by taking Motrin, relaxing in a quiet and dark place and applying moist heat to his forehead. Plaintiff testified that he is forgetful, has difficulty concentrating and has trouble breathing after exertion.

Plaintiff admitted to a prior addiction problem, but stated that he has not consumed alcohol in 6 weeks and illicit substances for 3 months. (Tr., Pgs. 667-688).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical question asked the VE to assume: (1) medium exertional work, (2) stand/walk for 6 hours in a workday, (3) sit for 6 hours in a workday, (4) can occasionally climb or balance, but never climb a ladder or scaffold, (5) no exposure to unprotected heights and hazards, (6) occasional gross manipulation. (7) moderate limitation of the ability to maintain attention and concentration, ability to perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workweek without interruptions from psychologically-based symptoms, perform at a consistent pace, (8) can understand, remember and carry out 3-4 step tasks and superficially interact with co-workers and the public and (9) no production standards or frequent changes. In response, the VE identified "very limited sedentary and light" jobs of product inspector, night guard and surveillance monitor. The VE described these jobs as comprising "two to three percent" of the total of light and sedentary jobs.

Upon cross-examination, the VE conceded that if Plaintiff's testimony was accurate in terms of his inability to grasp objects because of numbness in his arms and hands, the number of light and sedentary jobs would be reduced to "less that one percent." (Tr., Pgs. 688 -692).

## THE OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has low back pain and depression with anxiety. The ALJ found these impairments to be severe, but not meeting Listing 1.00, 11.00 or 14.00. The ALJ determined that Plaintiff could not return to his past relevant work as a machinist, but could perform a representative number of light and sedentary jobs.

### THE MEDICAL RECORD

The first 14 pages of Plaintiff's medical record concern his emergency treatment after the automobile accident in Mexico. These pages are in Spanish. There is no accompanying translation. Neither Plaintiff, Defendant nor the ALJ obtained a translation. Since there is a more than adequate medical record, which was developed after the accident to show Plaintiff's current condition, we regard the Mexican documents as unnecessary to our decision, but are somewhat perplexed by the presence of these documents in the record without a translation. In any event, surgery was performed on Plaintiff's right ankle in April, 2004 at Three Gables Surgery Center in Proctorville, Ohio by Jeffrey Shook, D.P.M. Dr. Shook's operative report indicates that the post-operative diagnosis was "(1) Peroneus brevis tendon tear, right ankle, (2) Nonunion fracture fragment, talar body with degenerative changes to the subtalar joint and ankle joint, right ankle, (3) Longitudinal tear of peroneus longus tendon, right ankle." (Tr., Pgs. 161-163).

Dr. Shook treated Plaintiff from March, 2004 to December, 2004. A CT scan of Plaintiff's right foot in March, 2004 indicated the presence of a fracture sustained in an automobile accident 4 months previous. An MRI of April, 2004 demonstrated a "signal abnormality throughout the posterior talus and superior posterior calcaneus." A cast was applied after the accident, but the fractures were revealed after the cast was removed. The foot and ankle was immobilized. The peroneal tendon damage was also damaged and there were "significant degenerative changes in the subtalar joint." Surgery was performed in April, 2004. The post-surgical examinations showed "minimal, if any, edema, reasonable range of motion, no evidence of ankle instability, excellent alignment of the ankle/subtalar joint," but Plaintiff continued to complain of pain when walking. (Tr., Pgs. 467-491 and 566-568).

Plaintiff was examined in August, 2004 by James Rosenthal, Psy. D., a clinical psychologist. The history given to Dr. Rosenthal revealed that Plaintiff lives in a trailer with his nephew. He was married in 1982 and has two teen-aged children, but has been separated from his wife, who complained about his substance abuse. Plaintiff admitted to consuming large amounts of beer and whiskey and has tried "speed, acid, marijuana and cocaine." He has not worked since the automobile accident in Mexico, but prior employment was with D&E Tool Co. and R&J Machine Shop. He complained about back, neck and right ankle pain as well as "feeling depressed and jittery." Dr.

4

Rosenthal assigned a GAF of 60 and diagnosed Plaintiff with "generalized anxiety disorder, mood disorder NOS and alcohol abuse." Dr. Rosenthal opined that Plaintiff could understand, remember and follow simple instructions. He had a mild impairment of his ability to relate to bosses, co-workers and the general public and a mild impairment of his ability to concentrate, sustain attention and complete daily work tasks. His ability to tolerate workplace stress was moderately impaired. (Tr., Pgs. 177-181).

Plaintiff received physical therapy at Huntington Physical Therapy in Huntington, West Virginia from July, 2004 to November, 2004 at the rate of one session per week. The therapy addressed Plaintiff's complaints of right ankle and cervical spine pain. (Tr., Pgs. 182-211).

Plaintiff was referred to Dr. Robert Johnston for repair of a "ventral incisional hernia," resulting from injuries sustained in the automobile accident in Mexico and the surgical treatment of those internal injuries. Dr. Johnson advised Plaintiff, who weighed 287 lbs. at the time, to lose at least 50 lbs. before he would perform the surgery and to wear an abdominal binder in the interim. (Tr., Pg. 218).

A CAT scan of December, 2004 showed that "the subtalar joint is fused, coalesced, hardware in good position. There is really very minimal peri-articular degenerative changes . . . Patient advised on over-the-counter anti-inflammatory medications." (Tr., Pgs. 219-220). Post-surgical care included the use of an equalizer boot with crutches, exercise and physical therapy. (Tr., Pgs. 221-232).

A physical residual functional capacity assessment was completed in February, 2005 by Myung Cho, M.D, an Agency reviewing physician. Dr. Cho found that Plaintiff could occasionally lift 50 lbs. and frequently lift 25 lbs. He could stand/walk for 6 hours in a workday and sit for 6 hours. He could occasionally climb a ramp or stairs and stoop, but never climb ropes, ladders or scaffolds. Dr. Cho expressed the opinion that the "claimants allegations of pain and limited functioning are greater than the medical evidence supports." (Tr., Pgs. 245-253).

Dr. Johnston reported in March, 2005 that:

> "This patient has been under my care since October, 2003. . . He
> has significant psychiatric disease, most notably bipolar affective
> disorder, which does limit his decision-making at times. This is

> under fair control with medication. In addition, he suffered a
> significant motor vehicle accident about 1 and ½ years ago,
> which left him with a broken right ankle. This limits his
> functional capacity in that he cannot ambulate without a fair
> amount of pain. . . He essentially cannot do any heavy work, nor
> can he stand for prolonged periods of time, more than 30
> minutes at most. I also think that due to his de-conditioning, he
> cannot work a full day at this point."

(Tr. Pg. 255).

In November, 2004, Dr. Johnstone reported that Plaintiff had bipolar disorder and osteoarthrosis and complained of chronic ankle and back pain. He was diagnosed with "chronic musculoskeletal pain of the right ankle and mild arthrosis of the lumbar spine as well as depression and generalized anxiety disorder." (Tr., Pg. 257). He was prescribed Oxycodone and referred to a pain clinic. (Tr., Pg. 258). In October, 2004, Dr. Johnstone reported that Plaintiff was denied admission to the Marshall University Pain Clinic. (Tr., Pg. 260).

Plaintiff was treated by Dr. Johnstone from October, 2003 until March, 2005. In October, 2003, Dr. Johnson discovered "evidence of fatty infiltrate of the liver, most likely alcoholic hepatitis." He warned against continued alcohol and smoking abuse. Plaintiff's swollen right ankle was treated by icing. Physical therapy was advised, but Plaintiff had no insurance during some of the time he was treating with Dr. Johnson; when he was insured, physical therapy was pursued. Diet and exercise were recommended. He was having marital and financial difficulties and appeared depressed and anxious. Inactivity contributed to his problems. Dr. Johnson felt that Plaintiff was bipolar and that his cervical pain was musculoskeletal in origin. Plaintiff had an incisional hernia in his abdomen that appeared to be worsening. (Tr., Pgs. 492-518).

X-rays taken in August, 2004 showed "multilevel spondylosis" in the dorsal spine, "mild degenerative disc disease at L5-S1" in the lumbar spine and "minor facet joint degenerative change at multiple levels" in the cervical spine. (Tr., Pg. 265). Dr. Johnstone's repeated advice was to stop drinking. Dr. Johnstone encouraged Plaintiff's wife to be supportive and referred him to Alcoholics Anonymous. (Tr., Pgs. 266-280).

6

A psychiatric evaluation was done in September, 2004 by Robelyn Marlow, Ph.D., a clinical psychologist. Dr. Marlow diagnosed Plaintiff with a mood disorder, generalized anxiety disorder and alcohol abuse. She found that Plaintiff had a mild restriction of his ability to perform the activities of daily living, a mild restriction of his ability to maintain social function and a mild restriction of his ability to maintain concentration, persistence or pace. (Tr., Pgs. 281-296).

Dr. Johnstone referred Plaintiff to University Psychiatric Associates in Huntington for evaluation and treatment. Kelly Dick, M.A. and Steven Cody, Ph.D. reported in June, 2004 that Plaintiff's "receptive and expressive language was unimpaired," that he was "able to sustain reasonable attention" and that his "thoughts and associations were logical and coherent." He was diagnosed with major depressive disorder and anxiety disorder among other things. The psychologists recommended individual therapy, but Plaintiff refused. (Tr., Pgs. 312-317).

Plaintiff had a cervical MRI in April, 2005 at Tri-State MRI in Huntington. The test showed "minimal disc disease at C6-C7 and T1-T2 abutting the adjacent chord but not causing significant compression." (Tr., Pgs. 327 and 445)). An MRI of the lumbar spine, also in April, 2004 showed "multi-level facet degenerative change, a disc bulge at L5-S1 and L4-L5 neural foraminal stenosis." (Tr., Pgs. 328 and 446).

Plaintiff treated with Dr. Phillip Spangler at University Physicians and Surgeons from June, 2004 to September, 2006. Dr. Spangler's office notes indicate that Plaintiff was depressed, had panic attacks, anxiety, sleep disturbance, mood disturbance, low energy, tearfulness, restricted affect and he suffered from suicidal thoughts and alcohol abuse. He was unemployed, financially strapped and undergoing a divorce. Plaintiff's speech was "logical and goal directed." Dr. Spangled manipulated his medications of Zoloft, Depakote, Klonopin and Seroquel. (Tr., Pgs. 297-311, 357-361, 390-393, 407-418 and 424-433).

Plaintiff was evaluated in August, 2000 by counselors at Prestera Center for Mental Health, in West Virginia. The conclusion was that Plaintiff was anxious, depressed, suffered from panic attacks and manic behavior and more recently, suicidal behavior. His distractibility, loss of interest, poor concentration and tendency to withdraw were rated as "severe." Plaintiff was determined to have a "moderate dysfunction" relative to his ability to maintain social relationships, but a "marked dysfunction" of his ability to maintain concentration and attention. (Tr., Pgs. 364-375 and 435-443).

Medical records from St. Mary's Medical Center in Huntington indicate that in June, 2005, Plaintiff was diagnosed with "lumbar spinal stenosis and lumbar radiculopathy" and given an epidural steroid injection. A drug screen was positive for Cocaine, a fact which led to a decision by David Carroway, M.D., Ph.D. to refuse to write prescriptions for narcotics. An MRI in April, 2005 showed "minimal disc disease at C6-7 and T1-2 abutting the adjacent cord without significant compression, multi-level facet degenerative changes with disc bulge at L5-S1 and L4-5 and L5-S1 neural foraminal stenosis." Range of motion in the cervical and lumbosacral spine was limited, but straight leg raising was negative bilaterally. (Tr., Pgs. 376-381).

Jeremy Fuller, M.D. reported in April, 2006 that Plaintiff's complaints of diffuse joint pain throughout his body do not correlate with x-rays "that really do not show any significant findings . . . ., none of which would necessitate narcotic needs." Plaintiff displayed no radicular-type symptoms, no bowel or bladder function loss and no loss of grip strength." There was, however, "diffuse muscle spasm, especially in the lumbar region bilaterally, shoulders and forearms." Dr. Fuller felt that Plaintiff's complaints of chronic pain had a "neuropathic component to it." (Tr., Pgs. 385-386 and 398-399).

Plaintiff underwent an epidural injection of Triamcidone and Buprivacaine in June, 2005 by David Caraway, M.D,. Ph.D. at St. Mary's Medical Center in Huntington. The space injected was L4-5. (Tr., Pg. 400).

Physical therapy records from HTP Physical Therapy Specialists indicate that Plaintiff was in a physical therapy program from July, 2004 to November, 2004 on a twice per week basis. In July, 2004, Therapist Joe Lambiotte reported that Plaintiff was able to walk without assistive devices and was fully weight bearing. The therapy plan was to increase range of motion in the right ankle and cervical spine and to increase strength in the right ankle. (Tr., Pgs. 527-556).

There are medical records from Torre Medica Hospitalizagion and from Dr. Salvador Rivera. (Tr., Pgs. 593-608) These records are in Spanish and no translations were provided. We know from Plaintiff's medical records generally that he sustained internal injuries as a result of the automobile accident in Mexico. Obviously, he was stabilized there before his ankle surgery in Proctorville, Ohio. The records also contain references to an incisional hernia in the abdomen. The inference is that surgery was performed in Mexico to treat the internal injuries and that accounts for the incision which

is the site of the present hernia. We do know that at least an exploratory laparotomy was performed in Mexico. We do not regard the translation of these records to be particularly useful in light of the fact that Plaintiff does not list the sequella of internal injuries to be a disabling condition and the fact that counsel did not regard these records as necessary to translate.

In September, 2006, the hernia was surgically repaired at St. Mary's Surgical Center by Doug Henson, M.D. (Tr., Pgs. 612-613 and 620-621). Plaintiff came to the Surgical Center via ambulance after complaining of severe pain at the site of the incisional hernia. (Tr., Pgs. 615-616).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(I), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity,

9

the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. at 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of

10

Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances

the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R § 404.1520a(c)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: None, mild, moderate, marked, and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then

complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.,* 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.,* 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan,* 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky,* 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler,* 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky,* 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,*

667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).In determining credibility, the ALJ may consider the claimant's testimony of limitations in light of other evidence of the claimant's ability to perform other tasks such as walking, going to church, going on vacation, cooking, vacuuming and making beds. *Heston v. Com'r*, 245 F.3d 528, 536 (6th Cir. 2001).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

## OPINION

In his First Statement of Error, Plaintiff asserts that the ALJ erred in his assessment of Plaintiff's credibility. Specifically, Plaintiff argues that the objective evidence supports Plaintiff's claim of disabling pain and that the ALJ gave undue weight to Plaintiff's prior substance abuse history in evaluating his credibility. We disagree with both prongs of this argument.

It is true that the ALJ found Plaintiff's credibility to be "poor." The ALJ stated that Plaintiff's subjective reports of disabling ankle pain "were not supported by the medical evidence." The ALJ commented that although Plaintiff stated that he uses a cane for his right ankle, the evidence showed that the "subtalar joint is fused" and the hardware inserted during the surgery is in good position. The

14

ALJ commented that Plaintiff "wears no special shoes and only a lace-up brace." The MRI showed "very minimal peri-articular degenerative changes."

Plaintiff testified that he uses a cane "to help his right ankle and low back." He also testified that he takes Motrin to alleviate ankle pain and that he elevates the ankle when it swells. He also indicated that he wears a velcro brace which prevents side-to-side movement, but that he cannot wear the brace when his ankle swells. Plaintiff testified that his pain medications, Motrin included, were "ineffective." Dr. Johnstone's opinion was that "Plaintiff cannot ambulate without a fair amount of pain."

We find Plaintiff's use of a cane to be an irrelevant consideration in evaluating Plaintiff's credibility. Canes are used to foster support, not alleviate pain. Plaintiff suffered a broken ankle with tendon damage. The surgery involved the insertion of screws and hardware. There is no reason to believe that Plaintiff's ankle was restored to the same pre-accident condition. However, there are objective facts in the record which would enable an evaluator to assess the level or degree of pain. One is the post-operative findings of the ankle surgeon, Dr. Shook, who stated that there was "minimal edema, reasonable range of motion, no evidence of instability and excellent alignment of the ankle/subtalar joint. A second objective finding is that Plaintiff was put on over-the-counter pain medications by Dr. Shook. A third is the opinion of Plaintiff's primary care physician, Dr. Fuller, who stated that "Plaintiff's complaints of diffuse joint pain throughout his body do not correlate with x-rays that really do not show any significant findings." Dr. Fuller felt that Plaintiff's complaints of disabling pain had a "neuropathic," meaning psychiatric, component to it. A fourth was the fact that physical therapist, Joe Lambiotte, reported in July, 2004 that Plaintiff was able to walk without canes or crutches and was fully weight-bearing before the program of physical therapy began. Although we disagree that Plaintiff's use of a cane detracts from his credibility, we do agree that the objective evidence relative to Plaintiff's right ankle problem does not support a finding of disabling pain.

Plaintiff's subjective reports of disabling pain are not limited to his right ankle. He has objective evidence of a disc problem in his cervical and lumbar spine as demonstrated by x-rays, taken in August, 2004 and an MRI in April, 2005. These objective studies demonstrate a basis for Plaintiff's subjective reports of pain; they do not establish that the degree or level of pain reported by Plaintiff should be evaluated as fully credible. The ALJ questioned the degree of self-reported pain because

15

it was never recommended that Plaintiff have back surgery, he was never referred to pain management, and Plaintiff was noncompliant with medical advice to cease drinking. The comment about referral to a pain clinic was erroneous. Plaintiff was referred by Dr. Johnstone to a pain clinic, but Plaintiff was not accepted as a patient. The ALJ also questioned Plaintiff's ability to work as a subcontractor in Texas in connection with his reports of debilitating pain.

The MRI, taken in April, 2005 showed "minimal disc disease at C6-7 and T1-2 without significant compression." It also showed multi-facet degenerative changes with disc bulge at L5-S1 and L4-5 and L5-S1 neural foraminal stenosis." There was limited range of motion in the cervical and lumbosacral spine, but straight leg raising was negative bilaterally. Plaintiff's lumbar pain was treated with a steroid injection at L4-5 in June, 2005. Dr. Cho felt that Plaintiff could frequently lift 25 lbs. and that Plaintiff's "allegations of pain and limited functioning are greater than the medical evidence supports," essentially the same conclusion reached by Dr. Fuller, Plaintiff's treating physician. We agree that Plaintiff's statement that he can only stand/walk for 4-5 minutes without intense pain and that he cannot sit for longer than 10-15 minutes are exaggerations. Even Dr. Johnstone, Plaintiff's treating physician, put a 30-minute limitation on Plaintiff's ability to stand and failed to mention any limitation on Plaintiff's ability to sit. We cannot fault the ALJ for taking issue with Plaintiff's subjective reports of debilitating pain and for affording Plaintiff less than full credibility because of them.

It is apparent that the ALJ was not impressed with Plaintiff's inability or refusal to comply with medical advice to stop drinking. The ALJ was also unimpressed with Plaintiff's abuse of narcotic drugs and Dr. Carroway's refusal to prescribe narcotics for pain because of Plaintiff's prior abuse of the drug policy. It could also be said that Plaintiff's obesity certainly did not help either his back or ankle pain and increased the risk of complications relative to the hernia repair. While none of these factors directly relate to Plaintiff's truthfulness at the hearing, they all have some detrimental affect upon Plaintiff's credibility in the sense that Plaintiff did not do all that he might have done or still might do to help himself.

In summary, we find Plaintiff's criticism of the ALJ's credibility determination to be ill-placed. There are objective reason in Plaintiff's medical record for questioning his credibility. The ALJ committed no error in this regard.

16

The second Statement of Error asserts a different twist upon Plaintiff's theme that the ALJ mis-evaluated Plaintiff's pain. In other words, counsel blames the ALJ for the ALJ's failure to develop the record regarding Plaintiff's pain. Plaintiff seems to assert here that he has multiple sources of pain, physical and psychiatric, and the source of his pain is not limited to his mental condition, spine or ankle, but relates to carpel tunnel syndrome, allergies, high blood pressure, high cholesterol and headaches, etc., all impairments the ALJ found to be non-severe. Plaintiff's own testimony was primarily about ankle and spine pain, although he did mention pain in his arms and shoulder as well as headaches. He also mentioned having carpel tunnel syndrome and the need to wear splints on his wrists at night. The record reflects that he had an incisional hernia, for which he had to wear an elastic binder before corrective surgery was done in September, 2006. We know of no pain attributed to high cholesterol or high blood pressure, both of which are controlled by medication. Plaintiff's nerve conduction studies disclosed only mild abnormalities which would affect wrist pain. Plaintiff testified that he suffers from daily headaches and treats them with Motrin, moist cloths to the forehead and a quiet environment. However, no medical source voiced an opinion about the functional limitations derived from headaches or carpel tunnel syndrome for that matter. Plaintiff did testify about pain in his shoulders and Dr. Fuller did find "diffuse muscle spasm" in the shoulders, but again, no medical source put any functional limitations upon Plaintiff's shoulder impairment. The record reflects that the ALJ did consider the sum total of Plaintiff's pain from various impairments, both severe and non-severe. In so considering, the ALJ made no prejudicial mistake.

The third Statement of Error is that the ALJ failed to consider Plaintiff's impairments in combination. Inherent in such an argument is a concession that Plaintiff's individual impairments did not meet any Listing, a finding the ALJ made and with which we agree. In addition to his physical impairments, Plaintiff has some mental or emotional deficiencies as well. Plaintiff mentioned only being forgetful and having difficulty concentrating in his direct testimony. Dr. Rosenthal, a clinical psychologist, found a moderate impairment of Plaintiff's ability to tolerate workplace stress and mild impairment of his ability to relate and to concentrate and attend. Dr. Marlow, also a clinical psychologist, agreed that Plaintiff had a mild impairment of his ability to relate and to maintain concentration, persistence or pace. Therapists at Prestera Center for Mental Health rated Plaintiff's impairment of his ability to concentrate and attend as "marked," but the impairment of his ability to

17

relate as "moderate." Dr. Spangler, a psychiatrist, found that Plaintiff was depressed and anxious, a diagnosis upon which Dr. Rosenthal and Dr. Marlow generally agreed, as did Ms. Dick and Dr. Cody. Ms. Dick and Dr. Cody found Plaintiff's receptive and expressive language to be unimpaired, a finding they shared with Dr. Spangler. Ms. Dick and Dr. Cody found that Plaintiff was "able to sustain reasonable attention," a finding they shared with Drs. Rosenthal and Marlow.

Substantial evidence supports a finding that Plaintiff had a mild or moderate impairment related to his ability to concentrate and attend, a mild or moderate impairment of his ability to relate, a moderate impairment of his ability to withstand workplace stress and minimal, if any, problem speaking, understanding or being understood. Substantial evidence also supports a finding that Plaintiff suffers from depression and anxiety, but no mental health provider voiced the opinion that Plaintiff was unable to work. Even Dr. Johnstone said that Plaintiff's "psychiatric disease" was under fair control with medication.

Plaintiff argues that the combination of Plaintiff's physical and mental or emotional impairments renders him unable to perform any substantial gainful activity. No mental health provider expressed that opinion and Dr. Johnstone, who did, attributed Plaintiff's inability to work a full day to "de-conditioning" and not to the cumulative effects of physical and psychiatric pain. The ALJ did consider Plaintiff's legitimate impairments in combination and felt that Plaintiff still retained the residual functional capacity to perform a limited range of light and sedentary jobs. We do not find that the ALJ made any error prejudicial to Plaintiff.

Lastly, the Plaintiff asserts that the ALJ's hypothetical was not a fair description of Plaintiff. We agree. The ALJ's hypothetical described Plaintiff as able to perform the exertional requirements of medium work, in other words, being able to lift 25 lbs. frequently and 50 lbs. on occasion. The ALJ relied upon the Residual Functional Capacity assessment of Dr. Cho, the only physician in the record who voiced an opinion on the subject. We are somewhat uncomfortable with this assessment in light of the fact that Plaintiff has bulging disks and degenerative changes in his spine and a recently repaired hernia, for which he wore an abdominal binder His ankle, although stable, has a somewhat restricted range of motion. On the other hand, Plaintiff is a relatively large man, weighing upwards of 275 lbs. We defer to the ALJ's judgment call on this issue because Dr. Cho's residual functional capacity assessment regarding Plaintiff's ability to lift is basically unchallenged.

18

But the ALJ also found that Plaintiff had the residual functional capacity to stand/walk for 6 hours in a workday. Again, the ALJ had to rely upon the opinion of Dr. Cho, a physician who neither examined nor treated Plaintiff. Plaintiff had significant surgery to repair a fracture and damaged tendon in his right ankle and complained of post-operative pain to Dr. Shook, the surgeon, and to therapists at Huntington Physical Therapy. Dr. Johnstone, also a treating physician, said that Plaintiff "cannot ambulate without a fair amount of pain . . . nor can he stand for prolonged periods of time, more than 30 minutes at most." Dr. Johnstone's opinion is not technically at odds with that of Dr. Cho because if one took a break for 5 minutes every ½ hour, there would be enough hours in a workday to stand/walk for 6 hours. Because of Plaintiff's weight, the damage done to his ankle and its propensity to swell after exertion, as well as his cervical and lumbar issues, we very much doubt that he could manage a job which required him to be on his feet for 6 hours a day, day after day. We do not infer that because Plaintiff has the ability to walk/stand for 30 minutes without a change of position, that he can walk/stand for endless 30-minute sessions.

The other physical restrictions imposed by the ALJ in his hypothetical are fully justified by common sense, such as precluding climbing of ropes, ladders and scaffolds and the mental restrictions were justified by the consensus of opinions provided by mental health providers.

Although the jobs of night guard might have been an erroneous choice because it conceivably would involve a considerable amount of walking, jobs such as surveillance monitor and product inspector do not and the latter two are sedentary. Because the latter two jobs are jobs which are significantly represented in the national economy and for which neither lifting nor standing/walking are occupational prerequisites, we find that any error committed by the ALJ in formulating his hypothetical question to the vocational expert was harmless to Plaintiff.

## CONCLUSION

Because substantial evidence supports the decision of the Administrative Law Judge and because the sole error in formulating the hypothetical question did not result in any prejudicial harm to Plaintiff, the decision should be affirmed. Plaintiff has the residual functional capacity to perform a limited range of light and sedentary work.

IT IS THEREFORE RECOMMENDED THAT: the decision of the Commissioner be AFFIRMED and this action be DISMISSED from the docket of this Court.

June 30, 2008

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**WILLIAM D. PAULEY,**
        **PLAINTIFF**

    **VS.**

**COMMISSIONER OF**
**SOCIAL SECURITY,**
        **DEFENDANT**

**CASE NO. 1:07CV292**
**(BARRETT, J.)**
**(HOGAN, M.J.)**

## NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 7-2-2008 . Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).